UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SHAWN LYON,

                     *Plaintiff*,

  -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS & COMMUNITY SUPERVISION,
Correction Officer J. POIRIER, Correction Officer
JEREMY D. BULLIS, Correction Officer JUSTIN
MAHAN, Doctor D'AMICO, Registered Nurse S.
LAFRANCE, Nurse #0415, Correction Officers
JOHN/JANE DOES # 1-10 and Medical Staff
JOHN/JANE DOES # 11-15,

                     *Defendants.*
------------------------------------------------------------------X

**COMPLAINT**

Jury Trial Demanded

Case No.:

9:26-cv-14(BKS/ML)

Plaintiff SHAWN LYON, by and through his attorneys, Ellie Silverman Law P.C., as and for his Complaint alleges as follows:

### PRELIMINARY STATEMENT

1. Plaintiff SHAWN LYON brings this action against the Defendants for the violation of his civil rights, while he was incarcerated at Clinton Correctional Facility ("Clinton" or "the Prison") and under the care and custody of Defendant NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION (hereinafter "Defendant DOCCS," "DOCCS" or "the Department").

2. On January 6, 2023, Defendant DOCCS had transferred Plaintiff to Clinton, a facility mired in controversy and a well-known history of protecting its systemically abusive correction officers.[1]

3. The Defendants (many of whom are repeat "offenders" and can easily be identified in overlapping cases throughout the years and many of whom are related to medical staff, supervisors or other officers with similar violent histories) have seemingly entertained themselves during this long history of strange, perverse, sadistic, often racist and intentionally torturous practices, including dragging i/i victims down the hallways and once in the appropriate area or blind spot, utilizing a "grocery bag type" plastic bag for asphyxiation until the victim loses consciousness or starts coughing and choking and begging for air; stripping them to their underwear; beating, punching, stomping, kneeing, and kicking them; banging their head against the wall and/or beating the bottom of their feet and/or ripping dreadlocks out of their hair; and ultimately walking out of the room only to turn around

---

[1] Restrained, Beaten, Asphyxiated: New York Prison Guards' Brutality Grows - The New York Times, https://www.nytimes.com/2025/11/24/nyregion/ny-prison-guards-abuse-brutality.html?unlocked_article_code=1.CVA.VI5A.BMZ0VTC0jHWN&smid=url-share

and claim injuries and manufacture false charges against the victim.

4. Some of the documented medical practitioners at Clinton have long been known to ignore, aid in, or even contribute to the cover up for instances of excessive force. It is a common practice and custom for certain officers who are not participating in the actual beating to look on and/or "turn the other cheek", and common practice and custom for certain nurses to ignore pleas for help, provide little to no medical care, often gaslighting the bloody, broken, injured and exhausted i/i victims by for example, reprimanding them for fighting or not properly documenting the injuries or the cause of the injuries, simply stating that they are fine, they should not fight, this is what they get or simply that they fell down.

5. Upon information and belief, many officers lead the facility's "beat up squads," as they are commonly nicknamed by the incarcerated population[2], who utilize the common practice–as specified here–of beating incarcerated people in areas with no cameras and asphyxiating them with plastic bags.

6. Sadly, Mr. Lyon is a victim of the corroded facility practice and people continue to try to shine a light on these Clinton terrors. For nearly two decades, victims, news reporters, investigators and lawyers have been shouting, highlighting, writing articles, going to the press, and litigating (either pro-se or with counsel) about it and nothing has been done. All while SHAWN LYON and other men similarly situated who are serving their time, trying to rehabilitate themselves, have to look over their shoulder every minute of every day in fear that today may be the day a racist or high-tempered officer is angry about a past grievance, a potential future complaint or just decides to have a little fun. Many times, the victims' claims are disregarded as untruths, but the long history of eerily consistent similar details paints the true picture.

- For example, on August 11, 2008, Bradley Ceasar, an incarcerated individual, got into a confrontation with correction officers at the Prison. Within hours, he was found dead in the Special Housing Unit ("SHU"). Investigators found that officers and a nurse ignored his pleas for help and provided no medical care. An autopsy later determined that his ribs had been so badly broken–due to blunt force trauma to his chest–that his lungs could not inflate properly, and he suffocated.[3] The only employee disciplined was the nurse, whose failure to provide medical intervention was memorialized on camera.

- In similarly veiled areas or blind spots, on October 3, 2010, Leonard Strickland, an incarcerated individual, was murdered by correction officers at the Prison.[4] After suffering from an apparent mental health crisis, Mr. Strickland was pushed down a flight of stairs–where there are no cameras–by a correction officer with a history of violence against incarcerated individuals and beaten at the bottom by nearly two dozen officers. He was then brought to an infirmary room and stripped. It is unknown what occurred in that room, as Mr. Strickland cannot testify and there are no cameras.[5] In Mr. Strickland's case, correction officers dragged him–ostensibly unconscious and near death–

---

[2] https://www.nytimes.com/2015/08/19/nyregion/fishkill-prison-inmate-died-after-fight-with-officers-records-show.html
[3] https://www.nytimes.com/2015/12/14/nyregion/clinton-correctional-facility-inmate-brutality.html; https://casetext.com/case/hepburn-v-state-22
[4] https://www.nytimes.com/2015/12/14/nyregion/clinton-correctional-facility-inmate-brutality.html; https://casetext.com/case/strickland-v-state-2019
[5] At this point, a handheld camera was turned on in accordance with the Department's policies regarding strip frisks. The recording starts with Mr. Strickland already stripped to his underwear. While attempting to frisk him, Mr. Strickland fell to the floor of the exam room twice. Instead of administering medical attention, the correction officers accuse him of resisting the search. Then, with his hands cuffed behind his back, Mr. Strickland is partially carried, partially dragged, face down by officers pulling on his cuffed hands, along a corridor and onto an elevator, and then dragged along another corridor to the Residential Crisis Treatment Program ("RCTP") for mental health observation. Several of the officers testified that they had concluded Mr. Strickland was willfully disregarding their commands and therefore resisting. The

2

handcuffed, and face down, along the infirmary's hallway, while a nurse looked on and said and did nothing.[6]

- Edwin Banks[7] alleges in a 2014 claim that he was gang-assaulted while handcuffed and facedown on the ground in the rotunda. In Edwin Banks' case, he alleges that the nurse who treated him immediately after the gang-assault minimized his injuries in order to help cover-up the assault. He even went as far as to state that medical staff at Clinton help cover up instances of excessive use of force by denying incarcerated individuals proper follow-up care.

- Following the 2015 prison escape at the facility, Patrick Alexander, an incarcerated individual, was handcuffed, placed in a broom closet–with no cameras–and interrogated by officers with no name tags. His head was slammed against the wall, and one of the correction officers put a plastic bag over his head and threatened to waterboard him.[8]

- Similarly, Victor Aponte,[9] incarcerated at Clinton during the 2015 prison escape, was interviewed by a "Captain America" in a camera-less room while one officer stood in front of the window blocking any view into the room. This Captain America, later revealed to be CO Chad Stickney, tied a plastic bag around Mr. Aponte's neck (similar to a noose) and tightened it until he lost consciousness.

- Thomas Murphy[10] and Paul Henry,[11] two incarcerated individuals, allege that they were beaten by correction officers at Clinton wearing steel toe boots. Mr. Henry states that Sergeant Matthew L. Liberty[12] was involved in his brutal assault. Edwin Banks[13] alleges that he was beaten and carried by each limb to the infirmary, with one officer grabbing his shirt collar so tightly that he lost consciousness. Once in an infirmary exam room, two of his dread locks were ripped from his skull. "Captain America," as described by Victor Aponte, or Chad Stickney, was sued in September 2015 by an incarcerated individual named Terry Daum, who claimed that Officer Stickney punched him in a head and grabbed his genitals during a search before "aggressively rubbing [Mr. Daum's] rectum like a credit card swipe and then attempt[ing] to jam his fingertips into [Mr. Daum's] rectum."[14]

- On May 19, 2016, Terry L. Cooper was killed at Clinton Correctional Facility in the B-Block by officers after he passed through the metal detector and allegedly activated it. With about four years left on his sentence, Mr. Cooper - with a diagnosed asthma condition -was grabbed by Officers at and assaulted and at some point asked for his asthma pump while stating he could not breathe. His requests were ignored or otherwise refused and he eventually collapsed after being beaten. After being dragged down the hallway to the infirmary, no aid was given to Mr.

---

NY State Commission of Quality Care, upon reviewing the handheld video footage, determined that "Strickland did not resist the officers, nor was he out of control." An autopsy determined that Mr. Strickland died from cardiorespiratory arrest due to a lack of oxygen–or, rather, that his heart gave out from stress induced by the altercation. In fact, the ambulance crew documented that there were markings suggesting that something may have been placed around his neck.

[6] A report by the State Commission of Correction said that the nurse "showed complete disregard of the obvious signs of a nonresponsive inmate." This nurse watched Mr. Strickland lay motionless in the hallway of the RCTP for nearly three minutes before intervening. When asked during a deposition why he didn't intervene sooner, he said that he had to wait for the Sergeant to determine if Mr. Strickland was still a safety risk. But the Sergeant placed the decision on the nurse in his own deposition. Yet even once CPR was administered, all staff, including the nurse, seemed uninterested in even trying to save Mr. Strickland's life. Medical experts who reviewed the video footage stated that because Mr. Strickland was handcuffed from behind the entire time, his back was never flat against the floor, compromising the effectiveness of the CPR. Only thirty minutes after they noticed he stopped breathing did the nurse ask to remove the handcuffs.

[7] https://www.nytimes.com/2015/12/14/nyregion/clinton-correctional-facility-inmate-brutality.html; Banks v. Trombley et al., NDNY 2014, 9:14-cv-999

[8] https://www.nytimes.com/2015/08/12/nyregion/after-2-killers-fled-new-york-prisoners-say-beatings-were-next.html

[9] Aponte v. Annucci, NDNY 9:18-CV-0524.

[10] https://www.nytimes.com/2015/12/14/nyregion/clinton-correctional-facility-inmate-brutality.html

[11] https://trellis.law/doc/district/5169231/henry-v-liberty

[12] It is currently unknown whether Sergeant Matthew L. Liberty and CO C. Liberty, a named Defendant here, are related. But Sergeant Matthew L. Liberty has at least four documented use of force incidents where incarcerated individuals allege he authorized and/or participated in placing a plastic bag over their heads.

[13] https://www.nytimes.com/2015/12/14/nyregion/clinton-correctional-facility-inmate-brutality.html; Banks v. Trombley et al., NDNY 2014, 9:14-cv-999

[14] https://www.nytimes.com/2015/10/02/nyregion/prison-guard-known-as-captain-america-is-feared-on-upstate-cell-block.html

Cooper, medical care was unreasonably delayed and he died. Following Mr. Cooper's death, the officers submitted false statements and manufactured false evidence to hide their malfeasance. According to the officers, Mr. Cooper reached into his pocket and struck two officers in the face with his closed fist. In reality, Mr. Cooper never struck the officers and there were no visible injuries on his hands. The officers wrote that he was brought down to the ground and continued to resist and prevented the officers from placing his hands in mechanical restraints and that the use of force lasted for about one minute. In reality, Mr. Cooper was struck with batons and beaten, including use of batons on his head. The jury believed Mr. Cooper's family and he was awarded a much deserved multi-million dollar verdict (including punitive damages against two of the officers), which one could assume the family would relinquish in one second if it meant bringing back Mr. Cooper.[15]

- On July 9, 2021, Lance Bishop was assaulted after a ridiculously disproportionate reaction to an officer not liking how Mr. Bishop was pleading for help. He was beaten in the Slaughterhouse and then dragged to the rotunda where he was assaulted again. He was choked and his head was banged against the wall, he was pushed up stairs while being called the N word and his dreadlocks being ripped out of his head.[16]

- On February 25, 2022, Tevin Jackson was on his way to an appointment when an officer indiscriminately sprayed him with a chemical agent after Mr. Jackson asked to speak to the area supervisor about a missing radio. Officers swarmed, jumped, punched and threw Mr. Jackson to the ground and then dragged him to the Slaughterhouse where while handcuffed, the beating continued until a plastic bag was placed over his head and he lost consciousness. The medical personnel turned the other way. Thereafter, officers manufactured false evidence, corroborated their lies for their reports and many of the recordings were missing or died as a result of dead batteries. Mr. Jackson was given a retaliatory ticket, which was later reversed.[17]

- On February 13, 2023 Jermaine Gotham had an asthma attack which the officers ignored and said he was lying. After being thrown against the wall and searched, he was dragged to the Slaughterhouse where he was viciously assaulted while being called racial slurs and hit with a metal baton. A plastic bag was placed over his head choking him and his glasses were knocked off of his face. The nurse eventually came back in and scolded Mr. Gotham, telling him "you shouldn't be fighting." After false reporting, manufactured evidence and corroborated lying, Mr. Gotham underwent a sham hearing and as a result, he lost 6 months of good time, horribly affecting his release date and parole opportunity.[18]

- On February 21, 2023 Paris and Curtis Perkins (brothers) were waiting to begin their day to work in the mess hall in the B Block when a group of officers, sergeants and OSI officers ambushed them. Paris and Curtis and other mess hall workers were pushed up against the wall, punched and kicked and were dragged down the stairs until they reached "Exam Room 1". They were kicked, stomped, punched, called "monkeys", choked with plastic bags and stripped down and photographed. After sham hearings and horrifying long punishments in the SHU, losing privileges and suffering in humane conditions, the officers coordinated their false reports and manufactured false evidence against them. Paris was then retaliatorily tried criminally and his case was dismissed by motion.[19]

- On August 24, 2024 Deveron Raymond was assaulted in the Slaughterhouse after being ambushed by a swarm of officers and retaliated against for asking for a sergeant. While being beaten the notorious "stop resisting!" was being yelled by the offending officers after which they dragged him and placed a plastic bag over his head. The hearing officer allegedly review the footage and saw no evidence of any officer attacks.[20]

7. The officers detailed in these prior stories (and many others that go without publicity)

---

[15] It should also be noted that the medical examiner originally reported no significant injuries and natural cause of death from asthma and then while on the stand at trial admitted that his autopsy report was mistaken and he neglected to report injuries.
[16] Represented by Ellie Silverman Law, Northern District of New York, Docket # 9:24-cv-01314-FJS-TWD
[17] Tevin Jackson is represented by Thompson Law PC in Court of Claims, Claim # 137834 and Ellie Silverman Law in Northern District of New York, Docket # 9:25-cv-00245-MAD-MJK.
[18] Represented by Ellie Silverman Law PC Claim # 141768, Court of Claims.
[19] Both Paris and Curtis Perkins are represented by Ellie Silverman Law PC. Court of Claims, Claim #s 141779 and 141788, respectively.
[20] Represented by Ellie Silverman Law.

manufactured fake injuries, corroborated their lies in their curiously similar incident reports, conducted sham hearings and then because of the severity of injuries and threats of potential grievances or worse, falsely criminally charge the incarcerated individual as a way to cover-up the officers' malfeasance. And this is precisely what happened to Mr. Lyon.

8. The violations of Plaintiff's civil and rights as claimed here therefore come at no surprise and the abuse by officers followed by their lies and false charges continues.

9. Plaintiff seeks justice for the Defendants' deliberate violations of his civil and constitutional rights.  This lawsuit demands accountability for the Defendants' senseless actions, and damages for the catastrophic injuries they caused.

## JURISDICTION AND VENUE

10. This action is brought pursuant to 42 U.S.C. § 1983 for violations of rights secured by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

11. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

12. Venue is proper pursuant to 28 U.S.C. § 1391 in the Northern District, which is the judicial district where the events giving rise to this claim took place.

## JURY DEMAND

13. Plaintiff demands a trial by jury in this action on each of his claims for which a jury trial is legally available.

## THE PARTIES

14. Plaintiff SHAWN LYON is a citizen of the United States and of the State of New York. At all times relevant to this complaint, he resided in the State of New York.

15. Defendant NEW YORK STATE DEPARTMENT OF CORRECTIONS & COMMUNITY SUPERVISION maintains, oversees and is responsible for Clinton.  Acting through the State of New York, the Department is authorized to maintain correctional facilities and is responsible for maintaining and supervising correctional facilities in the State of New York.  The Department assumes the risks incidental to the maintenance of correctional facilities and the employment of correctional officers and medical officials under its employ.

16. DOCCS is a public entity bound by both Title II of the American with Disabilities Act ("ADA") and the Rehabilitation Act of 1973.

17. DOCCS is responsible for ensuring that people sentenced to a term of imprisonment in a State correctional facility receive appropriate care and services required by law.

18. Defendants J. POIRIER, JEREMY D. BULLIS and JUSTIN MAHAN worked at all relevant times as New York State Correction Officers at Clinton.  They are sued here in their individual capacities.

19. Defendants D'AMICO, S. LAFRANCE and #0415 worked at all relevant times as New York State medical providers at Clinton. They are sued here in their individual capacities.

20. Defendants are referred to collectively in this complaint as "the individual Defendants."

21. At all relevant times, Correction Officer JOHN/JANE DOES # 1-10 and Medical Staff JOHN/JANE DOES # 10-15 are sued in their individual capacities and are referred to as CO DOES and Medical Provider DOES, respectively.

22. At all relevant times, the individual Defendants were employed by the State of New York and/or DOCCS and acted under color of law and in the course and scope of their duties and authority as officers, agents, servants, and employees of the State of New York and/or DOCCS. Accordingly, they are entitled to representation in this action by the New York State Attorney General's Office upon their request.

23. As officials employed by DOCCS, acting under the color of law in the course and scope of their duties and authority, the individual Defendants were responsible for not violating the incarcerated individuals' rights under 42 USC § 1983.

24. As officials employed by DOCCS, a public entity bound by both Title II of the ADA, the Rehabilitation Act of 1973 the individual Defendants were responsible for recognizing when incarcerated individuals display signs of medical and mental health emergencies and for taking appropriate measures to ensure that incarcerated individuals in such distress receive immediate medical and mental health attention.

25. As officials employed by DOCCS, a public entity bound by The Civil Rights Act of 1871, the individual Defendants had a responsibility to not discriminate against Plaintiff based on race.

26. As officials employed by DOCCS, a public entity bound by the Constitution of the United States, a government may not retaliate against individuals for exercising their rights under the First Amendment.

27. Upon information and belief, the individual Defendants are citizens of the United States and citizens and residents of the State of New York.

28. At all relevant times, the individual Defendants violated clearly established constitutional rights, of which a reasonable person operating in their position would have known and corrected.

29. The conduct of the individual Defendants caused Plaintiff to suffer from mental and physical anguish.

30. The conduct of the individual Defendants caused Plaintiff to suffer violations of his constitutional rights.

**STATEMENT OF FACTS**

31. Plaintiff realleges and incorporates by reference each allegation set forth in the

foregoing paragraphs as if fully set forth herein.

32. Plaintiff SHAWN LYON's complaint herein accrued on or about January 6, 2023 at or near 5:30-6:00pm (and/or evening time after it was already dark) and continued therefrom. On said day, DOCCS had just transferred Plaintiff from Wende Correctional Facility to Clinton.

33. Upon his arrival, while being unshackled, several officers made comments revealing that they knew Plaintiff was a former employee of the Department as a correction officer.

34. At the time this incident began, Plaintiff had just arrived at the Prison and was second in line in a group of incarcerated individuals.

35. Defendants CO DOES and J. POIRIER were escorting the newly arrived group to Lower F.

36. Defendants CO DOES and J. POIRIER had the group of incarcerated individuals walk in a line as they were escorted through Lower F corridor[21].

37. At some point during this processional, Defendants CO DOES and J. POIRIER stopped the incarcerated individuals at a "red line."

38. Defendants CO DOES and J. POIRIER ordered the first incarcerated individual in line to walk through the metal detector.

39. Defendants CO DOES and J. POIRIER then ordered Plaintiff to walk through the metal detector, which he did without issue.

40. Defendants CO DOES and J. POIRIER then directed Plaintiff to sit in the Body Orifice Scanning System ("BOSS") chair, an order which Plaintiff also promptly followed.

41. The BOSS chair beeped and one Defendant CO DOE dismissed the alarm, stating that it was a technical error – that he had swept Plaintiff's feet too fast.

42. Defendants CO DOES and J. POIRIER then instructed Plaintiff to sit in the BOSS chair again, which Plaintiff did.

43. As suspected, the second time, no alarm was triggered.

44. Defendants CO DOES and J. POIRIER then directed Plaintiff to get on the wall to be frisk searched. Plaintiff complied.

45. Without warning or provocation, nearly every correction officer present–which to Plaintiff appeared to be twenty (20)–started yelling "stop fighting"[22] and "put your hands back on the wall." This was another lie. Plaintiff was not fighting. Plaintiff was neither belligerent nor agitated.

---

[21] It is widely known among the incarcerated population that Lower F corridor–by the gym and package room–has no cameras.

[22] Per records from the Department, including a Use of Force report and misbehavior reports penned by Defendants Poirier and Bullis, Plaintiff was accused of fighting with another incarcerated individual, which prompted the "use of force."

7

46. At that moment, Plaintiff knew something was wrong, considering Plaintiff had, in fact, not moved his hands off the wall in any way, nor was he fighting.

47. This was an indication that an assault was imminent, as it is customary for some of the named DOCCS correction officers or other members of the "beat up squad" to accuse an incarcerated individual of not being compliant with a search or fighting–in order to justify or otherwise excuse an excessive use of force.

48. Almost instantly thereafter, Plaintiff felt the first blow to the back of his head.

49. Defendants CO DOES and and J. POIRIER began punching, kicking, and hitting Plaintiff with batons over and over in his head, face and all over his body, before then eventually calling for a response team, prompting several more officers to join in, including Defendants JEREMY D. BULLIS and JUSTIN MAHAN.

50. At one point, Individual Defendants and CO DOES grabbed Plaintiff's head and slammed it against the brick wall at least three (3) times.

51. One Defendant mentioned Plaintiff's criminal conviction while they beat him and held him in a choke hold.

52. Plaintiff remembers "a ton of fists, feet and batons" as he was punched to the ground.

53. Eventually, individual Defendants and CO DOES peeled Plaintiff off the ground and propped him up, as he could not stand on his own.

54. Then individual Defendants and CO DOES–including Defendant BULLIS directly– placed Plaintiff in mechanical restraints, grabbed him by the arms and dragged him into the infirmary hospital room on the first floor referred to by i/is as the "slaughterhouse" where there are also no cameras.

55. At least one (1) Sergeant was present in the infirmary room at this time.

56. Individual Defendants and CO DOES faced Plaintiff against a wall in the infirmary room and placed his hands on the wall.

57. Individual Defendants and CO DOES then took a plastic garbage bag, placed it over Plaintiff's head, tightened it and lifted him up by his neck, choking him with their hands.

58. Given Plaintiff's condition at the time, he could not see who was doing the choking.

59. Individual Defendants and CO DOES continued punching Plaintiff which he was getting choked and suffocated with the plastic bag. Plaintiff could not breathe at all during this part of the attack.

60. One Defendant mentioned Plaintiff's criminal conviction while they beat him and choked him.

61. While slightly suspended in the air with a bag over his head, Plaintiff began suffocating and slowly losing consciousness.

62. Individual Defendants and CO DOES eventually removed the bag from Plaintiff's head.

63. Individual Defendants and CO DOES then ordered Plaintiff to get undressed for a strip search.

64. Plaintiff was dizzy and could barely see, barely breathe, and was desperately trying to catch his breath.

65. Barely able to move or breathe, and while being threatened with "getting it again," Plaintiff used all of his remaining energy and undressed.

66. Individual Defendants and CO DOES then conducted an invasive strip search with Plaintiff in this vulnerable state.

67. Individual Defendants and CO DOES next thrusted a blue piece of paper into Plaintiff's hands, ordering him to sign it.

68. Plaintiff was given no time to read it and had no idea what the paper said, yet Individual Defendants and CO DOES forced him to sign.

69. Defendant LAFRANCE finally entered the room, turned to the officers and casually complained, "oh no, not again you guys, you can't keep doing this."

70. Defendant LAFRANCE then asked Plaintiff what had happened – with Individual Defendants and CO DOES still present in the room.

71. As such, Plaintiff responded that he did not know.

72. Defendant LAFRANCE took his vitals and was constantly walking in and out of the infirmary room, allowing the abuse to continue.

73. Any time Defendant LAFRANCE was out of the room, individual Defendants and CO DOES would make him go "high and flat" on the wall in a frisk position with just his boxers on.

74. Plaintiff's arms would get tired and start to go numb. Whenever his arms would droop even slightly, individual Defendants and CO DOES would threaten Plaintiff to keep them as high as he could reach.

75. To Plaintiff, this went on forever and he could barely stand due to his injuries, let alone hold his arms up.

76. Finally, Defendant LAFRANCE returned to the infirmary and recommended that Plaintiff be placed under observation, per a telephone order from Defendant D'AMICO, and stated that she "wanted nothing more to do with this."

9

77. Defendant LAFRANCE asked Plaintiff if he needed to take the elevator or if he would be able to use the stairs.

78. When Plaintiff opted for the stairs, individual Defendants and CO DOES mumbled "it's a good thing you chose the stairs."

79. Plaintiff chose the stairs because it is known that abuse often occurs within the confines of the elevator.

80. Individual Defendants and CO DOES thus escorted Plaintiff to an observation room within the infirmary.

81. Plaintiff, unable to put full weight on his knees, immediately hobbled over to the sink and started drinking water directly from the sink.

82. Plaintiff was afraid to lay down on the bed, believing that individual Defendants and CO DOES would return and start beating him again. As such, Plaintiff remained upright throughout the entire night due to terror and trauma.

83. Plaintiff stood there, holding on to the sink for dear life, for over four (4) hours terrified of further abuse, in pain, bruised and injured, having trouble breathing with his blood pressure plummeting without any examination by medical personnel despite defendants knowing his condition was serious.

84. While holding on to the sink for support and stability because Plaintiff was unable to stand on his own, at approximately 11:00pm, Defendant #0415, a nurse on the evening shift, arrived and stated that she "[couldn't] believe that no one had been in there to check on [him]," and that "for some reason, the last shift wanted nothing to do with [him]."

85. Defendant #0415, upon seeing that Plaintiff was in an episode of hypotension with dangerously low blood pressure, immediately said he needed to go to the emergency room for an evaluation and should have been sent hours ago.

86. Plaintiff arrived at Champlain Valley Physicians Hospital at approximately 12:43am.

87. Plaintiff's provider in the emergency room referred to him as "one giant bruise." They placed him in a cervical collar given the trauma to his head and neck, noted contusions to his chest wall and abrasions to both of knees and face, and gave him a Tramadol injection for the extreme pain he was experiencing.

88. Upon Plaintiff's discharge from the outside hospital, he returned to Clinton and was again placed under observation in the infirmary, where he remained until January 9, 2023.

89. Medical Provider DOES did not give Plaintiff his prescribed medications or allow him to ice his knee, which his provider at the outside hospital prescribed.

90. During this time, Plaintiff needed help sitting up and even rolling over in bed.

91. On January 9, 2023, CO DOES–including a Sergeant–escorted him to the Special Housing Unit ("SHU").

92. During this incredibly long and painful walk, the Sergeant made numerous comments to Plaintiff, urging him "to kill [himself]."

93. Plaintiff was then served with two misbehavior reports written by Defendants POIRIER and BULLIS, claiming that he had been in a fight with an unknown incarcerated individual. Both tickets were completely fabricated and false.

94. Plaintiff remained in SHU until January 18, 2023, unable to speak due to the damage caused by being choked. Plaintiff could not speak for days.

95. His retained criminal defense attorney began calling the facility to prepare for the hearing. Upon information and belief, Plaintiff's hearing officer swiftly dismissed all the disciplinary charges.

96. On January 18, 2023, upon his release from SHU, Defendants assigned Plaintiff to the APPU, a long-term protective custody unit for incarcerated individuals prone to abuse.

97. Upon information and belief, on January 19, 2023, Plaintiff received a "SHU Custody Review" dated January 18, 2023 which stated that he was to continue his SHU confinement, despite his release from SHU and the dismissal of his misbehavior reports.

98. Plaintiff requested medical attention for months following his return to Clinton and he was not provided with any additional outside care or further diagnostic testing despite the months of bruising and pain.

99. Upon information and belief, Plaintiff's bruises did not disappear for at least three (3) months.

100. Medical Provider DOES continue to provide anti-inflammatory medication–which is inappropriate long-term pain management–but never put him in to see any specialists or doctors, despite Plaintiff's repeated sick call requests.

101. To date, Plaintiff continues to have problems breathing.

102. Plaintiff's left shoulder and left knee continue to cause his significant pain, keeping him from walking properly (or without pain) or any sort of physical exercise that involves his arms or legs.

103. Plaintiff has received no official diagnoses for these injuries that plague him daily, keeping him from the appropriate treatments and accommodations.

104. Plaintiff underwent an x-ray on his knee but has received no further diagnostic testing which could determine if there is an injury that an x-ray could not pick up.

105. Plaintiff received no diagnostic testing for his shoulder until approximately recently

when the doctor reviewing said his shoulder was injured from this incident.

106. Plaintiff has been provided with no reasonable accommodations for these new disabilities.

107. Upon information and belief, he may still have fractured rib(s), which were discussed with him recently as well as continued neck pain from the chokehold and pain from the handcuffs being too tight.

108. As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff SHAWN LYON suffered the injuries and damages set forth above.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 (Excessive Force, Violation of Due Process & Right to Be Free From Cruel & Unusual Punishment)

109. Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

110. Defendants used excessive and unconstitutional force against Mr. Lyon and/or had the opportunity to but failed to intervene to stop the use of excessive and unconstitutional force against Mr. Lyon.

111. The use of force against Mr. Lyon was done maliciously and sadistically and constituted cruel and unusual punishment.

112. Here, the conduct is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. See Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005).

113. The Defendants' wrongdoings described above in the Plaintiff's Statement of Facts, which caused Plaintiff to suffer physical injury(ies), amounted to excessive force in violation of the Constitution.

114. Here, the Defendants satisfy the subjective prong that Defendants acted in bad faith and that the actions as described above, violated the standards of decency.

115. Defendants failed to protect Mr. Lyon from the conditions that posed a substantial risk of harm and the Defendants were aware of the risks to Mr. Lyon's health and safety and disregarded these substantial risks of harm.

116. The use of force against Mr. Lyon was done maliciously and sadistically and constituted cruel and unusual punishment.

117. The unlawful conduct of Defendants was willful, malicious, oppressive and reckless and was of such a nature that punitive damages should be imposed.

118. The Defendants' conduct was entirely unjustified and their actions constituted excessive use of force.

119. Defendants deprived him of his rights under the Eighth Amendment when they threatened him so severely that he was significantly physically and psychologically injured.

120. The Defendants by unjustifiably attacking the Plaintiff and their actions in the aftermath of the attacks violated Plaintiff's right to be free from punishment and deprivation of life and liberty without due process of law and to be free from deliberate indifference to those rights.

121. The use of force was not in an effort of good faith to restore discipline, but rather was used maliciously and sadistically to hurt Mr. Lyon.

122. Defendants were aware of the repulsive and dehumanizing conditions within the exam room and rooms he was placed in subsequent to the attacks.

123. In committing the acts and omissions complained of herein, individual Defendants acted under color of state law to deprive Plaintiff of his constitutionally protected rights under the First, Eighth, Fourth and Fourteenth Amendments to the United States Constitution.

124. The unlawful conduct of individual Defendants was willful, malicious, and oppressive and was of such a nature that punitive damages should be imposed.

125. As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff SHAWN LYON suffered the injuries and damages set forth above.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 (Deliberate Indifference to
### a) Serious Medical Needs–and –
### b) Safety including Failure to Protect/Unconstitutional Conditions of Confinement)

126. Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

127. As described in the Plaintiff's Statement of Facts, there were unreasonable risks to Plaintiff in general and also personal risks.

128. Here, Mr. Lyon's deprivation of rights throughout this extended experience or sequence of events were sufficiently serious. Moreover, the deliberate indifference was so sufficiently serious that a reasonable person in the Defendants' position would perceive that treatment was worthy and in many cases throughout this experience, necessary.

129. In addition to the Defendants directly participating in the deprivations, Plaintiff also spoke at several different times and told the officers and medical providers exactly what was wrong or what his issue was at the specific moment.

130. In committing the acts and omissions complained of herein, the medical provider Defendant acted with deliberate indifference to Mr. Lyon's serious medical needs

131. In committing the acts and omissions complained of herein, the medical provider

Defendant enabled and ignored Defendants' attacks on Mr. Lyon in the infirmary, either with malice or with negligence.

132. In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Mr. Lyon's serious medical needs.

133. In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Mr. Lyon's serious medical needs when they denied him medical attention and treatment as it was allegedly not safe to bring him there.

134. In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Mr. Lyon's safety while filming him in the first floor of the infirmary, knowing the reputation of said area, and while purposefully turning off his camera during abusive moments of Mr. Lyon.

135. In committing the acts and omissions complained of herein, Defendants acted under color of state law to deprive Plaintiff of his constitutionally protected rights under, among other rights - the Eighth Amendment to the United States Constitution.

136. As a direct and proximate result of the deprivation of his constitutional rights, Mr. Lyon suffered the injuries and damages set forth above.

137. The Defendants exercised deliberate indifference, failure to protect, a disregard for Plaintiff's safety, denial of medical attention, cruelty, extreme recklessness, and intent to known and probable risks to Plaintiff by failing to take remedial action and allowing a dangerous environment to become so pervasive at Clinton by allowing the abuse, attacks and dangerous conditions to exist.

138. The individual Defendants were aware of a risk to the life and safety of Plaintiff and failed to act and/or acted improperly, in deliberate indifference to Plaintiff's federally-protected constitutional rights.

139. Accordingly, Defendants violated the 8th Amendment because they acted with deliberate indifference to the health and well-being of Plaintiff.

140. Defendants had the power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard for Plaintiff's rights failed or refused to do so.

141. Defendants failed to comply with DOCCS policies and/or directives concerning adequate supervision and/or protecting incarcerated individuals from violent assaults.

142. Defendants also failed to provide adequate medical treatment in a timely fashion and refused to ensure that Plaintiff received the proper treatment.

143. Defendants were objectively aware of the serious risk of harm should Plaintiff not receive medical treatment and violated contemporary standards of decency by denying him timely and adequate medical treatment.

144. Defendants determined Plaintiff to have objectively serious medical needs.

145. The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

146. As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff SHAWN LYON suffered the injuries and damages set forth above.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 (Failure to Intervene)

147. Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

148. Defendants were under a duty of safeguarding the public and ensuring the appropriate execution of Defendant's role.

149. Plaintiff duly relied on Defendants' fulfillment of their duties.

150. Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in Defendants' presence.

151. At the time of the incidents, Defendants were observing and aware of the wrongful acts against Plaintiff.

152. At the time of the incident, Defendants neglected to intervene on Plaintiff's behalf in dereliction of their duty to Plaintiff and in deliberate indifference to Plaintiff's well-being.

153. Defendants violated Plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of Plaintiff's constitutional rights and the injuries or further injuries caused as a result of said failure.

154. Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in Defendants' presence by assault, abuse and punishments.

155. Defendants had reason to know that the Plaintiff was under attack and had extended opportunities to stop or otherwise mitigate it.

156. As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff SHAWN LYON suffered the injuries and damages set forth above.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands the following relief against Defendants, jointly and severally:

(a) compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

(b)     punitive damages to the extent allowable by law;

(c)     attorney's fees;

(d)     the costs and disbursements of this action;

(e)     interest; and

(f)     such other and further relief as this Court deems just and proper.

Dated: New York, New York
       January 1, 2026

                                             Yours, etc.

                                             */s/ Ellie Silverman*
                                             Ellie A. Silverman, Esq.
                                             Ellie Silverman Law P.C.
                                             *Attorneys for Plaintiff*
                                             SHAWN LYON
                                             745 5th Avenue, Suite 500
                                             New York, New York 10151